**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**GEORGE RAMONAS,**

       Plaintiff,

v.                                          **CIVIL ACTION NO. 3:08-CV-136
(BAILEY)**

**WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, et al.,**

       Defendants.

<u>**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

**I.**    <u>**Introduction**</u>

On this day, the above-styled matter came before the Court upon consideration of

Defendant Jefferson Memorial Hospital/West Virginia University Hospital-East, Inc.'s Motion

for Summary Judgment [Doc. 114] filed June 1, 2009; Plaintiff's Opposition to Defendant

Jefferson Memorial Hospital's Motion for Summary Judgment [Doc. 120]; and Defendant

Jefferson Memorial Hospital's Reply to Plaintiff's Opposition to JMH's Motion for Summary

Judgment [Doc. 123]. This matter has been fully briefed and is now ripe for disposition.

Based upon the foregoing, it is the opinion of this Court that the Motion for Summary

Judgment **[Doc. 114]** should be, and is, hereby **ORDERED GRANTED IN PART AND**

**DENIED IN PART**.

**II.**    <u>**Statement of Facts and Procedural History**</u>

On September 19, 2005, George Ramonas ("Ramonas"), age 57, crashed his

Maserati into a wall at Summit Point racetrack in Charles Town, West Virginia, at a speed

of 50-70 miles per hour.  Exh. 1, Ramonas Dep. Tr. at 132-33.  While the force of the impact broke his safety helmet and both airbags deployed, Exh. 1 at 141, 146-47, he managed to remove himself from the wreck and was fully conscious.  Mr. Ramonas was transported to the trauma center at Jefferson Memorial Hospital ("JMH") by ambulance. The EMS personnel fully immobilized Ramonas with a backboard and a cervical collar. Exh. 2, EMS run sheet.  Ramonas experienced severe pain during the trip to the hospital, Exh. 1 at 142, and when he arrived at JMH, he was in so much pain that he said at his deposition, "I don't think it was possible to get more pain, feel more pain than I was feeling at that time."  Exh. 1 at 153.

He was triaged by nurse Martha Mumaw, R.N., who noted Mr. Ramonas' pain level at "5" on a scale of 1 to 10.  Nurse Mumaw, however, triaged Ramonas as "Urgent" and took his vital signs, Exh. 3 at JH 002, but decided that it was unnecessary to give Ramonas a full chest, abdomen, and neurological evaluation, Exh. 3 at JH 003; Exh. 4, Milzman Dep. Tr. at 175-76, because his vitals were within normal limits.  Plaintiff argues Mr. Ramonas' vital signs showed that he had markedly high blood pressure, which can be indicative of severe pain in a non-hypertensive patient.  Exh. 4 at 177.  Nurse Mumaw's assessment further found Ramonas to be cooperative and calm; his facial features symmetrical; oriented motor response and speech; limited movement due to pain; and abnormal numbness in three toes on his left foot.

After triage, Ramonas was examined by the on-duty physician in the emergency room, Dr. Jeffrey Cook.  Exh. 5, Cook Dep. Tr. at 41.  Dr. Cook noted that Ramonas had a history of lower back pain and gave Ramonas a physical exam, upon belief that the car wreck had aggravated his existing back pain rather than creating a new injury.  Exh. 3, JH

2

006-7.  Dr. Cook reviewed the nursing assessment and performed a physical exam, which he indicated showed no abnormalities.  On examination of Ramonas' back, Dr. Cook noted spasms in the left buttock.  He did not find it necessary to palpate the chest wall, perform straight-leg-raising tests, and "never, ever evaluated the patient's ability to ambulate."  Exh. 4 at 186.

Additionally, Dr. Cook ordered film x-rays of Mr. Ramonas' lumbosacral spine and pelvic region.  He did not order x-rays of the chest despite the fact that Ramonas reported pain with deep breaths. Exh. 6, Sandhu Dep. Tr. at 61.

Dr. Cook chose not to seek an immediate radiology consult, which was available through in-house radiologist, Dr. Ammerman, who was still on the premises when the films were first developed, or through electronic transmission of the films to Morgantown.  Exh. 6 at 63; Exh. 7, Ammerman Dep. Tr. at 25-26.  Dr. Ammerman did, however, review the x-rays the next day and found them to be "within normal limits."

Upon reviewing the x-rays, Dr. Cook did not diagnose a fracture of the 5th left lumbar vertebra, a sacral body fracture, and two bilateral fractures through the ala of the sacrum.  Exh. 4 at 102.  Dr. Cook's examination also failed to uncover a fracture of the left seventh rib, Exh. 4 at 102.  Dr. Cook did not seek additional radiographic films such as an MRI or CT scan.  Neither Dr. Cook nor the other JMH personnel ever took a urine sample from Mr. Ramonas, thus they did not discover the kidney injury which Ramonas had also suffered in the crash.  Exh. 4 at 224-25.

Dr. Cook concluded that Ramonas was only suffering from "muscle spasms," and ordered that Ramonas be given an injection of Toradol for his pain as well as prescriptions for Percocet, Flexeril, and Motrin.  Exh. 3 at JH 007.  Following this examination, Dr. Cook

left orders for Ramonas' discharge.

The JMH nursing staff never reassessed Mr. Ramonas' pain levels or vital signs. Exh. 4 at 176-79, 247. Forms provided for reassessment are completely blank. Exh. 3 at JH 004. Additionally, no nurse ever reassessed Mr. Ramonas' condition or pain level after pain medication had been administered. Exh. 4 at 167.

When Ramonas, who was still in pain, learned that he was to be discharged, he "begged" Dr. Cook to admit him to the hospital. Exh. 1 at 66. Dr. Cook refused. On the discharge sheet, Dr. Cook noted that Ramonas' condition was "unchanged" from that on arrival. Mr. Ramonas was discharged and took a two hour ride in a pickup truck to his home in Washington, D.C.

There exists a factual dispute as to whether Mr. Ramonas was ambulatory at discharge. Ramonas contends he was unable to walk when he left the hospital and had to be wheeled on a gurney to the pickup, where he had to be carried and placed in the truck by JMH employees. Exh. 1 at 168. The JMH nursing staff, on the other hand, marked him as ambulatory at discharge. Exh. 3 at JH 005.

On the ride home, Ramonas stopped to have the prescriptions filled, and immediately took two Percocet. Exh. 1 at 159. Despite the injection of Toradol and the two Percocets, Ramonas was unable to walk when he arrived home and had to be carried into his house by a friend. Exh. 1 at 68. For the next three days, Ramonas was unable to move more than three inches in any direction. Exh. 1 at 167. He could not eat, drink, or go to the bathroom. Exh. 1 at 170-171.

On September 23, 2005, an ambulance was sent to Ramonas' home to take him to GW Hospital ("GWH"). Exh. 1 at 174, Exh. 12, GW 005. Ramonas was admitted to GWH

4

where examination discovered a fractured left seventh rib, a left transverse process fracture, a body of S2 fracture, and bilateral fractures of the sacral ala. Exh. 4 at 102. The doctors at GWH also noted that Ramonas had a kidney injury, vision floaters, hematuria, and abdominal pain. Exh. 4 at 169. He was discharged from GWH on October 3, 2005. Ramonas received home occupational therapy, physical therapy and pain management from October 3, 2005, to October 17, 2005. Additionally, he attended five outpatient physical therapy sessions between November 7, 2005, and December 21, 2005. See Exh. E, Human Touch Home Health, and F, GWH Physical Therapy.

Plaintiff has filed suit against JMH for the alleged negligence of its emergency room staff and for violating EMTALA by failing to provide an appropriate screening examination, failing to stabilize an emergency medical condition, and for transferring Ramonas in an unstable condition.

## III.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1]  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[2]  Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any

---

[1]
       FED. R. CIV. P. 56(c); *see* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986).

[2]
   ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250 (1986).

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[3]

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."[4] That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.[5] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6]

## IV. Discussion

Defendant JMH contends that it is entitled to summary judgment because (1) the plaintiff has failed to provide expert witnesses qualified to opine as to the standard of care of emergency room nurses and staff or to causation; (2) the plaintiff has failed to establish an agency relationship between JMH and defendant physician, Jeffrey Cook, M.D., or former defendant physician, Frederick Ammerman, D.O.; and (3) the plaintiff has failed to establish the essential elements of an EMTALA claim against JMH. Therefore, Defendant JMH argues the plaintiff cannot surpass the threshold inquiry demanded by Rule 56. This Court will address each argument in turn.

---

[3] *Anderson*, 477 U.S. at 250.

[4] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[5] Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248.

[6] *Anderson*, 477 U.S. at 249 (citations omitted).

**A.** **Plaintiff's expert witnesses are qualified to testify as to the applicable standards of care.**

Pursuant to West Virginia Code § 55-7B-7, "[t]he applicable standard of care and a defendant's failure to meet that standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court." [7]  This Court finds this to be the applicable law of the State of West Virginia and declines to extend it.

The plaintiff relies, in part, on the West Virginia Supreme Court of Appeals' ruling in **Duling v. Bluefield Sanitarium**, 149 W.Va. 567, 583, 142 S.E.2d 754, 765 (1965), for its proposition that it is proper for medical experts or other qualified persons to testify concerning standards of care of accredited hospitals and of nurses.  In its reply brief, the defendant takes issue with the plaintiff's reliance on the **Duling** case, decided in 1965, because nurses as we know them today are much "more than physicians handmaidens." While the defendant's self-serving argument that modern-day nurses carry greater responsibility may have some merit, it fails, however, to point to West Virginia case law which overrules, or even distinguishes, the **Duling** case.  Rather, the defendant asks this Court to make its own determination of what the appropriate West Virginia law *should* be by directing this Court to **Sullivan v. Edward Hospital**, 209 Ill.2d 100, 806 N.E.2d 645, an Illinois Supreme Court case in which a physician was found not qualified to testify as to the standard of care for the nursing profession where that physician was not licensed in that

---

[7]In cases where the lack of care or want of skill is so gross as to be apparent, or where the breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience, the plaintiff is not required to present expert testimony on those issues. *See **Banfi v. American Hosp. for Rehabilitation**, 207 W.Va. 135 (2000).  This is not the case here.

particular school (nursing).  *See also, **Dolan v. Galluzzo***, 77 Ill.2d 279, 284, 396 N.E.2d 13 (1979).

This Court disagrees with the defendant's proposition that the test for admissibility of expert witness testimony in West Virginia hinges on an artificial classification of the witness' title or licensure.  The defendant would have this Court adopt a bright line rule of law in which an emergency medicine physician shall only be permitted to provide expert testimony as to the standard of care applicable to emergency medicine physicians, neurosurgeons shall only be permitted to provide expert testimony as to the standard of care applicable to neurosurgeons, etc.  Rather, this Court will follow decades of caselaw which calls for such determinations to be based upon an expert's knowledge on the subject matter at issue and his or her ability to assist the trier of fact.

In a recent, well-reasoned opinion out of Nevada, ***Staccato v. Valley Hospital***, 123 Nev. 526, 170 P.3d 503 (2007), the state Supreme Court likewise was faced with a defendant's reliance on the Illinois Supreme Court's decision in ***Sullivan v. Edward Hospital***.  In that case, the Court also rejected the ***Sullivan*** case, holding that:

> Here, (defendant) relies primarily on Illinois decisional law for its argument that a physician is not qualified to attest to the nursing standard of care.  For example, (defendant) points to the Illinois Supreme Court's decision in ***Sullivan v. Edward Hospital***, in which the court, indicating that the nursing profession has moved beyond its former dependence on physicians and "into a realm where it must and can legally account for its own professional practices," affirmed a trial court order striking a physician's

8

testimony regarding the standard of care for nurses after concluding that such testimony might result in a higher standard of care being imposed upon the defendant nurse.

Aside from Illinois cases, (the defendant) relies on two unreported trial court decisions, one from Pennsylvania and one from Virginia. Neither court, however, cited to any legal authority for its decision to preclude physicians from testifying about the standard of care that defendant nurses had rendered. 209 Ill.2d 100, 282 Ill.Dec. 348, 806 N.E.2d 645, 659-60 (2004) (internal quotation marks omitted). We reject (defendant's) argument and the Illinois approach for two reasons. First, in Illinois, expert qualification turns on the particular credentials of the defendant medical caregiver, but in Nevada,[8] expert witness assessment turns on whether the proposed witness's special knowledge, skill, experience, training, or education will assist the jury. Therefore, a physician or other medical provider is not automatically disqualified from testifying against a defendant who specializes in a different area of medicine or who practices in a different medical discipline. Second, in our view, the Illinois approach is contrary to sound public policy because a separate nursing standard of care governing medical treatment does not exist. To the contrary, nurses generally are prohibited from providing medical diagnoses and provide treatment only under physician directives or in emergency situations. Although (defendant) maintains that

---

[8] Like West Virginia.

(the expert's) opinion would potentially hold the nurse involved in the alleged negligence to a standard higher than her profession requires, since both (the expert) and the nurse are qualified to administer intramuscular injections, we perceive no distinction between what standard of care is acceptable based on their specialized credentials. Instead, the acceptable standard of care is governed by the procedure or treatment at issue, not the defendant's practice area or specific license.

170 P.3d at 506-507 (footnote added).

Interestingly, the *Staccato* Court also noted that "[n]urses, likewise, have been deemed qualified to testify against physicians when they have demonstrated the requisite skill or knowledge to do so. *See Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996), *see also Avret v. McCormick*, 246 Ga. 401, 271 S.E.2d 832 (1980)." *Id*. at FN 13.

Indeed, under West Virginia law, "[w]hile a physician does not have to be board certified in a specialty to qualify to render an expert opinion, the physician must have some experience or knowledge on which to base his or her opinion." *Farley v. Shook*, 218 W.Va 680, 687, 629 S.E.2d 739, 746 (2006); *see Fortney v. Al-Hajj*, 188 W.Va. 588, 425 S.E.2d 264 (1992)(stating that experience may qualify physician to render an expert opinion and that a physician does not necessarily need to be board certified in a medical field to work in that medical field for purposes of physician's qualification to testify as an expert).

The *Shook* case is nearly on point with the facts of this case. In that case, the plaintiff's medical expert, an emergency room physician, was found to be qualified to provide expert testimony as to the alleged breach in standard of care by the emergency

10

room nurses and hospital with regards to their failure to retake the patient's vital signs during her stay in the ER.[9]

In this case, the plaintiff has presented a report and deposition testimony by a board certified emergency medicine physician who appears, at this stage, qualified to testify as to the standard of care for emergency room nurses. It is well established that physicians can opine as to the standard of care applicable to nurses. *See* ***Brooks v. Galen of West Va., Inc.***, 220 W.Va. 699, 709 (2007); ***Duling v. Bluefield Sanitarium, Inc.***, 149 W.Va. 567 (1965). Additionally, defendant's own nursing expert establishes the standard of care, which was not met in this case.

Plaintiff has identified David Milzman, M.D. to address the breach of the standard of care in this case. Dr. Milzman is Board Certified in Emergency Medicine, he is currently a Departmental Research Director and Associate Professor of Emergency Medicine at Georgetown University School of Medicine, he is the Senior Attending Physician in the Emergency Department at the Washington Hospital Center in Washington, D.C, and has been practicing for twenty years. Based on his education and experience, Dr. Milzman is familiar with, and well qualified to opine as to, the provision of health care in the emergency room. See Exh. 13, Milzman c.v.

In his deposition, Dr, Milzman identified several failings of the emergency room nurses which contributed to Mr. Ramonas' damages. Dr. Milzman criticized the nurses for (1) failing to take additional vital signs prior to discharge, Exh. 4 at 176-7, 247; (2) failing to reassess the patient's pain level, Exh. 4 at 179; (3) failing to evaluate the patient's

---

[9] This Court notes that the medical expert's opinion was ultimately rejected by the ***Shook*** Court because he was unable to provide the necessary links to establish causation.

reaction to pain medication, Exh. 4 at 167; (4) failing to properly note that the patient was not ambulatory at discharge, Exh. 4 at 190, 194-5; and (5) failing to properly chart and/or communicate this information to the emergency room physician. Exh. 4 at 177-8. Dr. Milzman also criticized the nursing staff for making a "poor decision" during triage when they decided "to obviate full evaluation as nonapplicable chest and abdomen and full neurologic evaluation." Exh. 4 at 175. Dr. Milzman also linked the nursing breaches to plaintiff's injuries when he stated that "the missing information could have resulted in worsening plaintiff's injuries" because Dr. Cook may have made a different decision. Exh. 4 at 178.

Defendant's argument that Milzman did not identify the standard of care applicable to the nurses is disingenuous. Every criticism of the nurses' omissions was based on the standard of care. Milzman's critiques are supported by JMH's own policies which require the nurses to perform those very tasks which were omitted, i.e. reassessment of pain, reassessment of vital signs, reassessment of the Glasgow Coma Scale, and the general reassessment of the patient's condition. Exh. 14, Milzman Affidavit; Exh. 8, JMH Policy on Assessment and Reassessment.

Ms. Ridgely — JMH's expert — also testified that the failure to reassess Mr. Ramonas' pain levels after the administration of Toradol and before discharge constituted a breach of the standard of care. Exh. 11 at 80-81. Ms. Ridgely emphasized that the standard of care required that nurses not discharge people in pain. See Exh. 11 at 96.

**B.** **Vicarious Liability/Respondeat Superior for the acts of a non-employee pursuant to a theories of "ostensible" or "apparent" agency and "actual agency"**

    **1.** **West Virginia Code § 55-7B-9(g) precludes JMH from liability under a theory of "ostensible" or "apparent agency."**

West Virginia Code § 55-7B-9(g) provides that "(a) health care provider may not be held vicariously liable for the acts of a non-employee pursuant to a theory of 'ostensible agency'[10] unless the alleged agent does not maintain professional liability insurance covering the medical injury which is the subject of the action in the aggregate amount of at least one million dollars." Dr. Cook and Dr. Ammerman are each insured in the amount of $1 million per occurrence under separate insurance policies. See Exh. K and L. Accordingly, as to the plaintiff's claims of ostensible agency, the defendant's motion for summary judgment is **GRANTED**.

    **2.** **Sufficient evidence exists that Dr. Cook was an "actual agent" of JMH.**

Defendant also contends that Dr. Cook is not an "actual agent" of JMH, and therefore no liability should attach to the hospital for his conduct. The existence of an agency relationship is a question of fact to determined by the jury — not on summary judgment. *See Thomson v. McGinnis*, 195 W.Va 465, 465 S.E.2d 922, 927 (1995)(improper to grant summary judgment where dispute as to agency relationship).

The test for an agency relationship includes four general factors for purposes of *respondeat superior*: 1) the selection and engagement of the servant; 2) payment and

---

[10] The terms "ostensible agency" and "apparent agency" are interchangeable. *See Burless v. WVU Hospitals*, 215 W.Va. 765, 772.

compensation; 3) power of dismissal; and 4) power of control. **Paxton v. Crabtree**, 184 W.Va. 237, 400 S.E.2d 245 (1990). "The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." **Burless v. West Viginia University Hospitals, Inc.**, 215 W.Va. 765, 601 S.E.2d 85 (2004). Other Courts have expanded the four general factors to encompass many other aspects of an agency relationship involving physicians, including whether the doctor had the ability to decline patients and which party supplied office space, support staff, supplies and equipment. **Wood v. U.S.**, 494 F.Supp. 792 (E.D. Va. 1980).

In addition, the defendant would have this Court believe that it must also find that the alleged employer "exercised the right to control the day-to-day performance of the (employee's) work" in order to conclude that an employer-employee relationship existed. **Paxton v. Crabtree**, 184 W.Va. 237, 246. The defendant's argument on this point, however, is taken out of context. In **Paxton**, the employee-employer relationship at issue was that of the Administrative Director and a magistrate judge's assistant. The right of control in that relationship is explicitly subject to the rules prescribed by the Supreme Court of Appeals and the duties specifically set out by statute in W.Va. Code § 50-1-9. Therefore, this Court finds such an argument inapplicable to the facts of this case.

In this case, the relationship between Dr. Cook and JMH meets the **Paxton** criteria for an actual agency relationship. First, as attested by Dr. Conrad Nau, the medical director of JMH and their 30(b)(6) representative designated to testify as to their relationship with Dr. Cook, JMH had the power to select and/or engage and/or reject Dr. Cook, Exh. 17, Nau Dep. Tr. at 25-26; JMH billed the patient for services provided by Dr.

Cook, Exh. 18, JMH bill for emergency room visit; JMH had the power to terminate the relationship with Dr. Cook, Exh. 17 at 32; and Dr. Cook was required to abide by all of the rules and regulations set forth in the hospital by-laws and policies.  Exh. 17 at 28. Furthermore, JMH did not inform patients that Dr. Cook was not employed by the hospital, Exh. 17 at 8; Dr. Cook did not have the option to decline patients, Exh. 17 at 38; and Dr. Cook did not provide staff, equipment, or supplies.  Exh. 5 at 46. The only real difference between Dr. Cook and the other staff physicians was the duration of their appointments. Exh. 17 at 33-34.  In fact, non-employee physicians are considered "part of the staff" for the duration of their appointment.  Exh. 17 at 28.  Accordingly, this Court **DENIES** the defendant's motion for summary judgment to the extent that a triable issue of fact exists as to whether Dr. Cook was an actual agent of JMH.

### C.      EMTALA

Congress enacted EMTALA "in response to a growing concern that hospitals were 'dumping' patients who were unable to pay, requires hospitals to perform these duties uniformly, regardless of whether the persons arriving in the emergency rooms are insured or are able to pay.  [*Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993)] n. 4.   As we stated in *Brooks*, Congress expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency.  Under traditional state tort law, hospitals are under no legal duty to provide this care.  Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it.  *Id*. at 710; *see also* *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880

(4th Cir. 1992)." ***Williams v. United States***, 242 F.3d 169 (4th Cir. 2001).

EMTALA imposes on participating hospitals[11] duties (1) to provide to persons presented for treatment 'an appropriate medical screening ... to determine whether or not an emergency medical condition ... exists,' and (2) to stabilize the condition or, if medically warranted, to transfer such persons to other facilities. 42 U.S.C. § 1395dd(a)- (c); *see also* ***Brooks v. Md. Gen. Hosp., Inc.***, 996 F.2d 708, 710 (4th Cir. 1993)." ***Williams v. United States***, 242 F.3d 169. EMTALA defines "an emergency medical condition" as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in - (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . .." 42 U.S.C. § 1395dd(e)(1)(A). Further, to survive the defendant's motion for summary judgment, the plaintiff has the burden of proffering sufficient evidence from which a reasonable jury could find, by a preponderance of the evidence, that "(the defendant) actually knew of that (emergency medical) condition . . .." ***Baber v. Hospital Corp. of America.***, 977 F.2d 872, 883. "If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition." ***Id***. This is where the plaintiff's claim falls short.

***Pettyjohn v. Mission-St. Joseph's Health System, Inc.***, 21 Fed.Appx. 193 (4th Cir. 2001), provides a good example of EMTALA's practical application in the Fourth

---

[11] A hospital is a "participating hospital" under EMTALA if it receives Medicare funding. *See* 42 U.S.C. § 1395dd(e)(2). The defendant is a participating hospital.

Circuit.  In that case, the medical experts opined that the patient had an emergency medical condition within the meaning of EMTALA when he presented to the hospital's emergency room.  In that case, the lower court assumed arguendo that such testimony was sufficient to meet the first element.

With respect to the second element – whether the hospital actually knew of that condition – the expert opined that, based upon all of the information that the treating ER physicians  recorded in the patient's medical record during his visit to the ER, the doctors *should have* known that the patient had an emergency medical condition within the meaning of EMTALA.  The court concluded that such expert opinion evidence was insufficient to meet the plaintiff's burden of proving actual knowledge on the part of the defendant hospital of the severity of the plaintiff's condition.  In this regard, the court emphasized that "the medical record is clear that [the Defendants] not only identified the disease from which (the plaintiff) was suffering, but also the severity of the symptoms, and determined that he was stable."  (J.A. 415).  Thus, the court reasoned, "[t]he [H]ospital's perception of the severity of the diagnosis cannot be separated from the diagnosis itself."  Id.  The court finally concluded that, at most, the plaintiff's expert testimony supports medical malpractice claims, which the law clearly states are beyond the scope of EMTALA.  ***Vickers v. Nash Gen. Hosp., Inc.***, 78 F.3d 139, 143 (4th Cir. 1996) (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice.").

In affirming the lower court's decision, the Fourth Circuit Court of Appeals held that "the expert deposition testimony was insufficient for a reasonable jury to find that (the doctors) actually knew that the defendant had an emergency medical condition within the

meaning of EMTALA. At most, (the expert's) testimony support[ed] possible medical malpractice claims, which claims plainly fall outside the scope of EMTALA. *Vickers*, 78 F.3d at 143 (EMTALA 'does not provide a cause of action for routine charges of misdiagnosis or malpractice.'); *Baber*, 977 F.2d at 880 ('Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.')." *Pettyjohn v. Mission-St. Joseph's Health System, Inc.*, 21 Fed.Appx. 193, 196.

The Court further noted the absence in the record of any evidence suggesting that the hospital had ever treated another patient with symptoms the same as or similar to the defendant more aggressively than it treated him. The Court of Appeals has held that absence to be "significant to (its) analysis given that 'disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim....' *Vickers*, 78 F.3d at 144." *Pettyjohn*, 21 Fed.Appx. at 196.

A.     **Defendant and its agent failed to actually appreciate Ramonas' condition as an "emergency medical condition."**

Plaintiff's EMTALA expert, Dr. Kenneth Stein, testified that he believed severe pain to be an emergency medical condition, and that untreated pain was also an emergency medical condition. Exh. 19, Stein Dep. Tr. at 102. This testimony, like that in *Pettyjohn*, satisfies the first element of an EMTALA claim. That, however, is all the plaintiff can establish. Dr. Stein stated that whether or not Ramonas was in severe pain when he presented to JMH was "up for debate," Exh. 19 at 103, and that Ramonas' level of pain was

for the trier of fact to sort out. Exh. 19 at 104. EMTALA requires more than this; it requires that the defendant "actually knew of that condition . . .." **Baber**, 977 F.2d at 883.

By plaintiff's own admission, Dr. Cook could not have "actually known" of the emergency medical condition. Specifically, plaintiff's expert, Dr. Milzman, testified that it is his "opinion that, in this case, the medical screening examination by Dr. Cook <u>was not adequate to determine if an emergency medical condition existed</u>." (Emphasis added). Indeed, Dr. Cook obviously did not actually know of the emergency medical condition. This is evidenced by the fact that Dr. Cook's own examination and his review of the nurse's notes revealed to him that Ramonas' condition presented the following: a pain level at "5" on a scale of 1 to 10, which was recorded as sharp, moderate pain similar to Ramonas' prior chronic back pain; vitals within normal limits; patient was cooperative and calm; his facial features symmetrical; oriented motor response and speech; limited movement due to pain; abnormal numbness in three toes on his left foot; and spasms in the left buttock. This diagnosis clearly falls short of an "acute . . . pain such that the absence of immediate medical attention could reasonably be expected to result in - (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . .." 42 U.S.C. § 1395dd(e)(1)(A). Accordingly, the plaintiff's EMTALA claim must fail.

### B. Plaintiff fails to establish disparate treatment in his medical screening.

This Court finds an absence in the record of any evidence suggesting that the hospital had ever treated another patient with symptoms the same as or similar to the defendant more aggressively than it treated him. In **Pettyjohn**, 21 Fed.Appx. at 196, the

Fourth Circuit Court of Appeals found that absence to be "significant to (its) analysis given that 'disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim....' *Vickers*, 78 F.3d at 144."

Based upon the triage nurse's initial screening of Ramonas, which included taking his vitals, Dr. Cook performed his own physical evaluation of Ramonas' eyes, ears, nose, throat, neck, respiratory system, cardiovascular system, abdomen, skin and extemities. Dr. Cook found all of the above to be within normal limits. Dr. Cook further performed an examination of Ramonas' back, performed a neurological examination, and ordered x-rays of Ramonas' lumbosacral spine and pelvis, which he also found to be within normal limits. Given these results, Dr. Cook did not find it necessary to perform any more extensive testing.

Additionally, this Court certainly is not convinced that this decision was in any way influenced by his inability to pay for treatment as evidenced by his presentation of insurance; furthermore, plaintiff's expert, Dr. Siegal, concedes this point. Based upon the above, this Court is not convinced that the treatment Ramonas received fell to the level at which EMTALA was enacted to prevent. Simply put, Ramonas was by no means a victim of "patient dumping" as anticipated by the Act. Accordingly, as to this claim the motion for summary judgment is **GRANTED**.

C.    **Any shortcomings in the screening or diagnosis are issues to be resolved by the remaining MPLA claims.**

The plaintiff argues that, for purposes of EMTALA, whether a hospital's screening procedure is "appropriate" is a question of fact and that his experts have testified that JMH

did not provide an appropriate screening exam. This Court disagrees with the plaintiff's proposed standard; rather, these opinions are better suited to address that plaintiff's MPLA claims, which plainly fall outside the scope of EMTALA. *Vickers*, 78 F.3d at 143 (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice."); *Baber*, 977 F.2d at 880 ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.").

EMTALA additionally requires that a hospital stabilize and emergency medical condition, 42 U.S.C. § 1395dd(b), and forbids the transfer of any individual until the individual's condition has been stabilized. 42 U.S.C. § 1395dd(c). The term "transfer" includes the discharge of an individual. While Ramonas was discharged in what, in hindsight, may have been in a state of emergency medical condition, as previously noted Dr. Cook's belief at the time was that the plaintiff did not have an emergency medical condition.

Dr. Siegel testified that JMH violated EMTALA by failing to stabilize Ramonas' condition. Exh. 21 at 45. Dr. Siegel testified that stabilization "should have included measures to further diagnose the etiology of the emergency medical condition, and to attempt to relieve the emergency medical condition to some extent – which was mostly evidenced by pain – and neither of those were performed as stabilization in this case." Id. He went on to explain that there were various ways Ramonas' condition could have been stabilized: "One, would have been to control the pain better. Two would have been to admit the patient to the hospital for care, pain control, bed rest. Dr. Siegel emphasized that "pain

control, in this case, was a key part of the stabilization, no matter what else was done. It was a part of whatever should be done." Exh. 21 at 51. This is, however, exactly what Dr. Cook attempted to remedy when he administered an injection of Toradol for his pain as well as writing prescriptions for Percocet, Flexeril, and Motrin. Exh. 3 at JH 007. Therefore, this Court finds Dr. Cook's diagnosis and treatment did not violate EMTALA. Accordingly, as to this claim the motion for summary judgment is **GRANTED**.

## V.    Conclusion

Accordingly, based upon the above, it is the opinion of this Court that Defendant Jefferson Memorial Hospital/West Virginia University Hospital-East, Inc.'s Motion for Summary Judgment **[Doc. 114]** should be, and the same is, hereby **ORDERED GRANTED IN PART AND DENIED IN PART** in accordance with this Court's above rulings.

It is so **ORDERED**.

The Clerk is directed to transmit a copies of this Order to all counsel of record herein.

**DATED:** August 7, 2009.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE