**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**GEORGE RAMONAS,**

          Plaintiff,

v.
                                   **CIVIL ACTION NO. 3:08-CV-136**
                                   **(BAILEY)**

**WEST VIRGINIA UNIVERSITY**
**HOSPITALS-EAST, et al.,**

          Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO RECONSIDER

**I.**    **Introduction**

On this day, the above-styled matter came before the Court upon consideration of Plaintiff's Motion to Reconsider (this Court's August 7, 2009, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment) [Doc. 132]. Defendant filed its Response in Opposition [Doc. 136]; Plaintiff filed his Reply in Support [Doc. 137]; and the defendant filed its surreply [Doc. 138-1]. This matter has been extensively briefed and is now ripe for disposition. Based upon the findings set out below, it is the opinion of this Court that Plaintiff's Motion to Reconsider **[Doc. 132]** should be, and the same is, hereby **DENIED**.

**II.**    **Statement of Facts and Procedural History**

On September 19, 2005, George Ramonas ("Ramonas"), age 57, crashed his Maserati into a wall at Summit Point racetrack in Charles Town, West Virginia, at a speed of 50-70 miles per hour. Exh. 1, Ramonas Dep. Tr. at 132-33. While the force of the

impact broke his safety helmet and both airbags deployed, Exh. 1 at 141, 146-47, he managed to remove himself from the wreck and was fully conscious. Mr. Ramonas was transported to the trauma center at Jefferson Memorial Hospital ("JMH") by ambulance. The EMS personnel fully immobilized Ramonas with a backboard and a cervical collar. Exh. 2, EMS run sheet. Ramonas experienced severe pain during the trip to the hospital, Exh. 1 at 142, and when he arrived at JMH, he was in so much pain that he said at his deposition, "I don't think it was possible to get more pain, feel more pain than I was feeling at that time." Exh. 1 at 153.

He was triaged by nurse Martha Mumaw, R.N., who noted Mr. Ramonas' pain level at "5" on a scale of 1 to 10. Nurse Mumaw, however, triaged Ramonas as "Urgent" and took his vital signs, Exh. 3 at JH 002, but decided that it was unnecessary to give Ramonas a full chest, abdomen, and neurological evaluation, Exh. 3 at JH 003; Exh. 4, Milzman Dep. Tr. at 175-76, because his vitals were within normal limits. Plaintiff argues his vital signs showed that he had markedly high blood pressure, which can be indicative of severe pain in a non-hypertensive patient. Exh. 4 at 177. Nurse Mumaw's assessment further found Ramonas to be cooperative and calm; his facial features symmetrical; oriented motor response and speech; limited movement due to pain; and abnormal numbness in three toes on his left foot.

After triage, Ramonas was examined by the on-duty physician in the emergency room, Dr. Jeffrey Cook. Exh. 5, Cook Dep. Tr. at 41. Dr. Cook noted that Ramonas had a history of lower back pain and gave Ramonas a physical exam, upon belief that the car wreck had aggravated his existing back pain rather than creating a new injury. Exh. 3, JH 006-7. Dr. Cook reviewed the nursing assessment and performed a physical exam, which

he indicated showed no abnormalities. On examination of Ramonas' back, Dr. Cook noted spasms in the left buttock. He did not find it necessary to palpate the chest wall, perform straight-leg-raising tests, and "never, ever evaluated the patient's ability to ambulate." Exh. 4 at 186.

Additionally, Dr. Cook ordered film x-rays of Mr. Ramonas' lumbosacral spine and pelvic region. He did not order x-rays of the chest despite the fact that Ramonas reported pain with deep breaths. Exh. 6, Sandhu Dep. Tr. at 61.

Dr. Cook chose not to seek an immediate radiology consult, which was available through in-house radiologist, Dr. Ammerman, who was still on the premises when the films were first developed, or through electronic transmission of the films to Morgantown. Exh. 6 at 63; Exh. 7, Ammerman Dep. Tr. at 25-26. Dr. Ammerman did, however, review the x-rays the next day and found them to be "within normal limits."

Upon reviewing the x-rays, Dr. Cook did not diagnose a fracture of the 5th left lumbar vertebra, a sacral body fracture, and two bilateral fractures through the ala of the sacrum. Exh. 4 at 102. Dr. Cook's examination also failed to uncover a fracture of the left 7th rib. Exh. 4 at 102. Dr. Cook did not seek additional radiographic films such as an MRI or CT scan. Neither Dr. Cook nor the other JMH personnel ever took a urine sample from Mr. Ramonas; thus, they did not discover the kidney injury which Ramonas had also suffered in the crash. Exh. 4 at 224-25.

Dr. Cook concluded that Ramonas was only suffering from "muscle spasms," and ordered that Ramonas be given an injection of Toradol for his pain as well as prescriptions for Percocet, Flexeril, and Motrin. Exh. 3 at JH 007. Following this examination, Dr. Cook left orders for Ramonas' discharge.

3

The JMH nursing staff never reassessed Mr. Ramonas' pain levels or vital signs. Exh. 4 at 176-79, 247. Forms provided for reassessment are completely blank. Exh. 3 at JH 004. Additionally, no nurse ever reassessed Mr. Ramonas' condition or pain level after pain medication had been administered. Exh. 4 at 167.

When Ramonas, who was still in pain, learned that he was to be discharged, he "begged" Dr. Cook to admit him to the hospital. Exh. 1 at 66. Dr. Cook refused. On the discharge sheet, Dr. Cook noted that Ramonas' condition was "unchanged" from that on arrival. Mr. Ramonas was discharged and took a two-hour ride in a pickup truck to his home in Washington, D.C.

There exists a factual dispute as to whether Mr. Ramonas was ambulatory at discharge. Ramonas contends he was unable to walk when he left the hospital and had to be wheeled on a gurney to the pickup, where he had to be carried and placed in the truck by JMH employees. Exh. 1 at 168. The JMH nursing staff, on the other hand, marked him as ambulatory at discharge. Exh. 3 at JH 005.

On the ride home, Ramonas stopped to have the prescriptions filled, and immediately took two Percocet. Exh. 1 at 159. Despite the injection of Toradol and the two Percocets, Ramonas was unable to walk when he arrived home and had to be carried into his house by a friend. Exh. 1 at 68. For the next three days, Ramonas was unable to move more than three inches in any direction. Exh. 1 at 167. He could not eat, drink, or go to the bathroom. Exh. 1 at 170-171.

On September 23, 2005, an ambulance was sent to Ramonas' home to take him to GW Hospital ("GWH"). Exh. 1 at 174, Exh. 12, GW 005. Ramonas was admitted to GWH where examination discovered a fractured left seventh rib, a left transverse process

4

fracture, a body of S2 fracture, and bilateral fractures of the sacral ala. Exh. 4 at 102. The doctors at GWH also noted that Ramonas had a kidney injury, vision floaters, hematuria, and abdominal pain. Exh. 4 at 169. He was discharged from GWH on October 3, 2005. Ramonas received home occupational therapy, physical therapy and pain management from October 3, 2005, to October 17, 2005. Additionally, he attended five outpatient physical therapy sessions between November 7, 2005, and December 21, 2005. See Exh. E, Human Touch Home Health, and F, GWH Physical Therapy.

Plaintiff has filed suit against JMH for the alleged negligence of its emergency room staff and for violating the Emergency Treatment and Active Labor Act ("EMTALA") by failing to provide an appropriate screening examination, failing to stabilize an emergency medical condition, and for transferring Ramonas in an unstable condition.

On August 7, 2009, this Court granted in part and denied in part the defendant's motion for summary judgment. See Doc. 127. The plaintiff now moves this Court to reconsider its Order as to the portion in which summary judgment was granted in favor of Defendant JMH, which dismissed the EMTALA claim.

**III.    Standard for Reconsideration**

"[A] district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." ***American Canoe Ass'n., Inc. v. Murphy Farms, Inc.***, 326 F.3d 505, 514-15 (4th Cir. 2003). While the Federal Rules of Civil Procedure do not explicitly address motions to reconsider, such motions are properly considered pursuant to Fed. R. Civ. P. 54(b). Motions for reconsideration of interlocutory orders are not subject to the strict

standards applicable to motions for reconsideration of a final judgment. ***American Canoe***, 326 F.3d at 514; *see **United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.***, 576 F.Supp.2d 128, 130 (D.D.C. 2008)("Courts have more flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b).")(citation omitted). Rule 54(b) allows a court to revise its own interlocutory orders "as justice requires." Fed. R. Civ. P. 54(b).

## IV.    Discussion

Congress enacted the Emergency Treatment and Active Labor Act ("EMTALA") "to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." ***Power v. Arlington Hosp. Ass'n***, 42 F.3d 851, 856 (4th Cir. 1994). "The Act accordingly imposes two principal obligations on hospitals. First, it requires that when an individual seeks treatment at a hospital's emergency room, 'the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition' exists. § 42 U.S.C. 1395dd(a). Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must 'stabilize the medical condition' before transferring or discharging the patient. § 42 U.S.C. 1395dd(b)(1)." ***Vickers v. Nash Gen. Hosp., Inc.***, 78 F.3d 139, 142 (4th Cir. 1996).

The Act further requires hospitals to perform these duties uniformly, regardless of whether the persons arriving in the emergency rooms are insured or are able to pay. *See **Brooks v. Md. Gen. Hosp., Inc.***, 996 F.2d 708, 710 n. 4 (4th Cir. 1993). As the Fourth

Circuit noted in **Brooks**, Congress expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency. Under traditional state tort law, hospitals are under no legal duty to provide this care. Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it. **Brooks**, 996 F.2d at 710; *see also* **Baber v. Hosp. Corp. of Am.**, 977 F.2d 872, 880 (4th Cir. 1992).

EMTALA defines "an emergency medical condition" as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in - (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . .." 42 U.S.C. § 1395dd(e)(1)(A). Further, to survive the defendant's motion for summary judgment, the plaintiff has the burden of proffering sufficient evidence from which a reasonable jury could find, by a preponderance of the evidence, that "(the defendant) actually knew of that (emergency medical) condition . . .." **Baber**, 977 F.2d at 883. "If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition." **Id**. This is where the plaintiff's claim falls short.

**Pettyjohn v. Mission-St. Joseph's Health System, Inc.**, 21 Fed.Appx. 193 (4th Cir. 2001), provides a good example of EMTALA's practical application in the Fourth Circuit. In that case, the medical experts opined that the patient had an emergency medical condition within the meaning of EMTALA when he presented to the hospital's emergency room. In that case, the lower court assumed, *arguendo*, that such testimony

was sufficient to meet the first element.

With respect to the second element – whether the hospital actually knew of that condition – the expert opined that, based upon all of the information that the treating ER physicians recorded in the patient's medical record during his visit to the ER, the doctors *should have* known that the patient had an emergency medical condition within the meaning of EMTALA. The Court concluded that such expert opinion evidence was insufficient to meet the plaintiff's burden of proving actual knowledge on the part of the defendant hospital of the severity of the plaintiff's condition. In this regard, the Court emphasized that "the medical record is clear that (the defendants) not only identified the disease from which (the plaintiff) was suffering, but also the severity of the symptoms, and determined that he was stable." (J.A. 415). Thus, the Court reasoned, "[t]he [H]ospital's perception of the severity of the diagnosis cannot be separated from the diagnosis itself." Id. The Court finally concluded that, at most, the plaintiff's expert testimony supported medical malpractice claims, which the law clearly states are beyond the scope of EMTALA. *See Vickers*, 78 F.3d at 143 (EMTALA "does not provide a cause of action for routine charges of misdiagnosis or malpractice.").

In affirming the lower court's decision, the Fourth Circuit Court of Appeals held that "the expert deposition testimony was insufficient for a reasonable jury to find that (the doctors) actually knew that the defendant had an emergency medical condition within the meaning of EMTALA. At most, (the expert's) testimony support[ed] possible medical malpractice claims, which claims plainly fall outside the scope of EMTALA. *Vickers*, 78 F.3d at 143; *see Baber*, 977 F.2d at 880 ('Questions regarding whether a physician or

other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.').*" **Pettyjohn**, 21 Fed.Appx. 193, 196.

The Court further noted the absence in the record of any evidence suggesting that the hospital had ever treated another patient with symptoms the same as or similar to the defendant more aggressively than it treated him.  The Court of Appeals has held that absence to be "significant to (its) analysis given that 'disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim . . ..' **Vickers**, 78 F.3d at 144." **Pettyjohn**, 21 Fed.Appx. at 196.

The plaintiff raises three issues for reconsideration.  This Court will now address them in turn.

**A.      Defendant and its agent failed to actually appreciate Ramonas'
         condition as an "emergency medical condition."**

In Plaintiff's Motion for Reconsideration, this Court is asked to review its ruling that JMH did not have actual knowledge of the plaintiff's emergency medical condition.  Plaintiff argues that JMH was in fact aware of an alleged emergency medical condition through the initial screening examination by the triage nurse.  The plaintiff's argument is based on its own determination that the triage nurse's categorization of Mr. Ramonas' condition upon presenting to the ER as "Urgent" is analogous to an "emergency medical condition."  The plaintiff, however, cites no case law to support this self-serving conclusion.

The term "urgent," as defined by the JMH triage guidelines, is a "condition that involves risk of significant complication, disability or impairment of bodily functions."  Exh.

3, JMH Scope of Emergency Services, Triage Guidelines, pg. 00021. While it is true that Ramonas was initially triaged as "urgent," upon further screening, in which Nurse Mumaw took Ramonas' vital signs, she ultimately decided that it was unnecessary to give Ramonas a full chest, abdomen, and neurological evaluation because his vitals were within normal limits. Plaintiff argues Mr. Ramonas' vital signs showed that he had markedly high blood pressure, which can be indicative of severe pain in a non-hypertensive patient. Nurse Mumaw's assessment further found Ramonas to be cooperative and calm; his facial features symmetrical; oriented motor response and speech; limited movement due to pain; and abnormal numbness in three toes on his left foot. More importantly, Dr. Cook's review of the nurse's notes revealed that Ramonas' condition presented the following: a pain level at "5" on a scale of 1 to 10, which was recorded as sharp, moderate pain similar to Ramonas' prior chronic back pain; vitals within normal limits; patient was cooperative and calm; his facial features symmetrical; oriented motor response and speech; limited movement due to pain; abnormal numbness in three toes on his left foot; and spasms in the left buttock.

What the plaintiff fails to appreciate is that a distinction lies between a triage determination and a medical screening. Triage is used to categorize patients for the purpose of determining in what order they will be treated by a physician. Triage does not constitute "medical screening" as that term is defined in EMTALA. *See **Scruggs v. Danville Regional Medical Center, LLC***, 2008 WL 4168645 (W.D. Va. 2008) (" . . . triage is not the equivalent to a medical screening examination and merely determines the order by which patients are seen in the emergency department."). Thus, it is the specific findings

as a result of the initial screening mentioned above, not an emergency room term used to determine how quickly a patient is to be seen, which this Court will ultimately consider.

Based upon the actual diagnosis, on its face, rather than the term used to classify the plaintiff's appearance upon arrival, this Court finds that his condition clearly fell short of an "acute . . . pain such that the absence of immediate medical attention could reasonably be expected to result in - (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . .." 42 U.S.C. § 1395dd(e)(1)(A).

As previously noted in this Court's Order, the plaintiff's EMTALA expert, Dr. Kenneth Stein, testified that he believed severe pain to be an emergency medical condition, and that untreated pain was also an emergency medical condition. Exh. 19, Stein Dep. Tr. at 102. While an accurate statement of law, this fails to establish an EMTALA claim. This testimony, like that in **Pettyjohn**, could form the basis to satisfy the first element of an EMTALA claim if a jury were to find that Ramonas was in fact in the severe pain contemplated by EMTALA. That, however, would be all the plaintiff could establish.

EMTALA requires more than this; it requires that the defendant "actually knew of that condition . . .." **Baber**, 977 F.2d at 883. What is important is what Dr. Cook actually found. This consists of a "5" on a scale of 1 to 10 pain level described as "moderate." This clearly falls short of "acute pain." Dr. Stein stated that whether or not Ramonas was in severe pain when he presented to JMH was "up for debate," Exh. 19 at 103, and that Ramonas' level of pain was for the trier of fact to sort out. Exh. 19 at 104. That, however, is not the applicable standard. Again, it is Dr. Cook's evaluation that this Court shall consider. By

11

the plaintiff's own admission, Dr. Cook could not have "actually known" of the emergency medical condition. Specifically, plaintiff's expert, Dr. Milzman, testified that it is his "opinion that, in this case, the medical screening examination by Dr. Cook <u>was not adequate to determine if an emergency medical condition existed</u>." (Emphasis added). If the plaintiff seeks to pursue that self-destructing line of argument, he in effect concedes that Dr. Cook did not actually know of the emergency medical condition. Accordingly, this claim must fail.

Alternatively, based upon the appropriate standards as set forth below, this Court ultimately finds that any shortcomings on the behalf of Dr. Cook or Defendant JMH, viewed with the benefit of hindsight, amount to nothing more than charges of misdiagnoisis better suited for examination under the plaintiff's MPLA claims.

Among the shortcomings, which may very well support a claim under MPLA, include the following diagnosis discovered days later: Upon reviewing the x-rays, Dr. Cook did not diagnose a fracture of the 5th left lumbar vertebra, a sacral body fracture, and two bilateral fractures through the ala of the sacrum; Dr. Cook's examination also failed to uncover a fracture of the left 7th rib, Dr. Cook did not seek additional radiographic films such as an MRI or CT scan; and neither Dr. Cook nor the other JMH personnel ever took a urine sample from Mr. Ramonas; thus, they did not discover the kidney injury which Ramonas had also suffered in the crash. For purposes of EMTALA, however, what Dr. Cook *did not* discover is not the central issue. We must look to the course of action Dr. Cook took based upon his screening. Following extensive screening, what Dr. Cook *did* conclude was that Ramonas was only suffering from "muscle spasms" and pain and, based upon his

diagnosis, ordered that Ramonas be given an injection of Toradol for his pain as well as prescriptions for Percocet, Flexeril, and Motrin. Exh. 3 at JH 007. Following this examination, Dr. Cook left orders for Ramonas' discharge. While not dispositive, this Court does believe this diagnosis and course of treatment does collaborate a finding that Dr. Cook did not actually know an emergency medical condition existed.

Further, Plaintiff's line of argument ignores the distinction between the initial screening examination - the focus of EMTALA - and the correctness of the treatment which follows from the screening. EMTALA requires a screening examination "to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. 1395dd(a). It is not disputed that Dr. Cook screened Ramonas upon his arrival at the emergency room. As a result of this screening, Dr. Cook determined that Ramonas suffered from "muscle spasms" and moderate pain. Pursuant to this diagnosis, Dr. Cook treated the injury with pain management.

It seems self-evident that, had Dr. Cook diagnosed Ramonas as suffering from more severe internal injuries, he may well have ordered further diagnostic testing and additional radiographic films such as an MRI or CT scan. "But the accuracy of the diagnosis is a question for state malpractice law, not EMTALA; the Act 'does not impose any duty on a hospital requiring that the screening result in a correct diagnosis.' *Brooks*, 996 F.2d at 711; *Baber*, 977 F.2d at 879. Instead, 'questions related to . . . diagnosis remain the exclusive province of local negligence and malpractice law.' *Gatewood*, 933 F.2d at 1039." *Vickers*, 78 F.3d at 143. The plaintiff simply ignores this basic principle; instead, he assumes that Dr. Cook *should have* diagnosed Ramonas differently (and in hindsight

perhaps more accurately).

For this Court to find otherwise would render the Act indistinguishable from state malpractice law. *See Vickers*, 78 F.3d at 144. "As a result, when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening. *See Power*, 42 F.3d at 858 ('Ignoring . . . variations in the exercise of medical judgment would be inconsistent with the intent of the appropriate screening provision of EMTALA.'). In fact, not only does treatment based on diagnostic medical judgment not violate the Act, it is precisely what EMTALA hoped to achieve-handling of patients according to an assessment of their medical needs, without regard to extraneous considerations such as their ability to pay. *See Brooks*, 996 F.2d at 711." *Id*.

**B.      Plaintiff fails to establish disparate treatment in his medical screening.**

The plaintiff also urges this Court to reconsider its ruling that no disparate treatment has been established. The plaintiff asks this Court to measure Dr. Cook's treatment against that of JMH's screening standards. This Court, however, must look not to whether Dr. Cook adhered to these policies, but rather whether he received disparate treatment as measured against patients presenting similar symptoms. This Court has reviewed the record, and again finds an absence of any evidence suggesting that the hospital had ever treated another patient with symptoms the same as or similar to the defendant more aggressively than it treated him.

In this case, following the triage nurse's initial screening of Ramonas, which included taking his vitals, Dr. Cook performed his own physical evaluation of Ramonas' eyes, ears,

nose, throat, neck, respiratory system, cardiovascular system, abdomen, skin, and extremities. Dr. Cook found all of the above to be within normal limits. Dr. Cook further performed an examination of Ramonas' back; performed a neurological examination; and ordered x-rays of Ramonas' lumbosacral spine and pelvis, which he also found to be within normal limits. Given these results, Dr. Cook did not find it necessary to perform any more extensive testing.

In *Pettyjohn*, 21 Fed.Appx. at 196, the Fourth Circuit Court of Appeals found that absence of any evidence suggesting that the hospital had ever treated another patient with symptoms the same as or similar to the defendant more aggressively than it treated him to be "significant to (its) analysis given that 'disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim . . ..' *Vickers*, 78 F.3d at 144."

Simply put, EMTALA's requirement that individuals seeking emergency care receive an "appropriate screening examination" obligates hospitals to "apply uniform screening procedures to all individuals coming to the emergency room." *Matter of Baby K*, 16 F.3d 590, 595 (4th Cir.), *cert. denied*, 513 U.S. 825 (1994); *see Baber*, 977 F.2d at 879. The screening provision, "at the core," thus "aims at disparate treatment." *Brooks*, 996 F.2d at 713. Here, the plaintiff attempts to assert a violation of this requirement by alleging that Ramonas received less screening, both in quantity and quality, than required by JHM's own policies rather than comparing it to those other patients presenting these same medical conditions. A more properly stated claim under EMTALA's screening provision would follow as such: Ramonas received less treatment than "other patients presenting in this same

medical condition," which would invoke the language of disparate treatment, the linchpin of an EMTALA claim. The argument runs essentially as follows: Ramonas arrived at the emergency room with "severe" pain; patients who suffer from such severe pain normally undergo diagnostic testing for internal injury; because Ramonas received only pain treatment and not testing for internal injuries, he was treated disparately from other individuals presenting in the same medical condition.

Assuming, *arguendo*, that Plaintiff had made such a claim, this line of argument, however, would still ignore the distinction between the initial screening examination, the focus of EMTALA, and the correctness of the treatment that follows from the screening. EMTALA requires a screening examination "to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. 1395dd(a). Here, Dr. Cook did screen Ramonas upon his arrival at the emergency room. As a result of this screening, Dr. Cook determined that Ramonas suffered from "muscle spasms" and pain. Pursuant to this diagnosis, Dr. Cook treated the pain with medication. Of course, had Dr. Cook diagnosed Ramonas as suffering from more severe internal injuries, he may well have ordered more extensive diagnostic testing, which could have ultimately lead to the discovery of the more serious injuries. The logic follows that an accurate diagnosis would have prompted different treatment than Ramonas in fact received. "But if disparate treatments based on disparate diagnoses sufficed to raise a claim under EMTALA, every allegation of misdiagnosis could automatically be recast as a claim under the Act: An improperly diagnosed patient can always assert that a properly diagnosed patient would have received a different course of treatment. *See Summers*, 69 F.3d at 905 (Arnold, C.J., dissenting). Such an outcome

would plainly subvert Congress' intent that EMTALA remain distinct from state malpractice law." **Vickers**, 78 F.3d at 144.

The flaw in this reasoning is the failure to take the actual diagnosis as a given. "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment. *See* **Baber**, 977 F.2d at 885." *Id*. Therefore, "[a]s a result, when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening. *See* **Power**, 42 F.3d at 858. In fact, not only does treatment based on diagnostic medical judgment not violate the Act, it is precisely what EMTALA hoped to achieve-handling of patients according to an assessment of their medical needs, without regard to extraneous considerations such as their ability to pay. *See* **Brooks**, 996 F.2d at 711. This Circuit's opinion in **Baber**, 977 F.2d at 872, makes clear that disparate treatment of individuals perceived to have the same condition is the cornerstone of an EMTALA claim, and that treatment decisions based on medical judgment consequently fall outside the Act." *Id.*

Additionally, this Court certainly is not convinced that Dr. Cook's medical treatment decisions were in any way influenced by the plaintiff's inability to pay for treatment as evidenced by his presentation of insurance[1]; furthermore, plaintiff's expert, Dr. Siegal, concedes this point. Based upon the above, this Court is not convinced that the treatment

---

[1] This Court in no way found it dispositive in its determination of Ramonas' ability to pay the fact that the injuries sustained stemmed from an accident in which Ramonas crashed his Maserati.

Ramonas received fell to the level at which EMTALA was enacted to prevent.  Simply put, Ramonas was by no means a victim of "patient dumping" as anticipated by the Act.

**C.      Dr. Cook's screening was in no way so cursory as to be the equivalent of providing no screening examination at all.**

Finally, in his motion for reconsideration, the plaintiff alleges that the defendant violated EMTALA because "(Dr. Cook's screening was) so cursory as to be the equivalent of not providing a screening examination at all."  Plaintiff's main fact upon which he bases this claim rests upon the disputed fact that "the hospital's screening exam never even determined that Ramonas could not walk."   The examination, however, did recognize the plaintiff's limited movement due to pain and abnormal numbness in three toes on his left foot.  Again, a factual dispute remains as to whether Mr. Ramonas was ambulatory at discharge.  Ramonas contends he was unable to walk when he left the hospital and had to be wheeled on a gurney to the pickup, where he had to be carried and placed in the truck by JMH employees.  The JMH nursing staff, on the other hand, marked him as ambulatory at discharge.

This Court, while concerned that a hospital possibly failed to recognize a patient's ability to ambulate, does not find this fact alone, even if proven, to be dispositive.  The facts must be analyzed as a whole.   Accordingly, based upon a thorough review of the examination and subsequent treatment, this Court finds the examination was not so cursory as to be the equivalent of providing no screening at all.  To illustrate this finding, this Court can simply look to the facts of other cases in which EMTALA claims have failed.

For example, in ***Baber***, the patient suffered a laceration of her scalp, a physician

examined the wound and elected to treat it with sutures, and the patient ultimately died from a subdural hematoma and a fracture of her skull. The plaintiff alleged that x-rays of the skull would have identified the fracture, and failure to do so violated EMTALA's screening requirement. The Fourth Circuit rejected the plaintiff's argument, observing that "Ms. Baber was initially screened and evaluated in [the hospital's] emergency department." *Id*. at 881. In the doctor's "medical judgment," it reasoned, the "head injury was not serious and did not indicate the need at that time for a CT scan or x-rays." *Id*. The Court acknowledged that "Ms. Baber's condition may have been misdiagnosed originally," but determined that "there is no evidence demonstrating that the hospitals or physicians failed to treat her." *Id*. at 885. Instead, the doctor "treated Ms. Baber for what he perceived to be her medical condition." *Id*. (emphasis added). This, the Court found, was sufficient to defeat the EMTALA claim of inappropriate screening.

Similarly, in **Vickers**, the physician treated the patient for what he "perceived to be" Vickers' medical condition. In his medical judgment, like that of the physician in **Baber**, the laceration did not warrant testing for intracranial injury. The treating ER physician instead treated the laceration with sutures. He also ordered x-rays of Vickers' cervical spine, and kept him in the hospital for a period of eleven hours before releasing him. Thus, the Court held, "[in] light of the substantial medical attention paid to Vickers, the circumstances are far afield from those that concerned Congress in enacting EMTALA. And while the reasonableness of Dr. Hughes' medical conclusions may well be called into question, this is the province of state malpractice law; negligence claims under state law are in fact pending." **Vickers**, at 144-145.

19

The same analysis must apply in this case. Again, in this case, upon the triage nurse's initial screening of Ramonas, which included taking his vitals, Dr. Cook performed his own physical evaluation of Ramonas' eyes, ears, nose, throat, neck, respiratory system, cardiovascular system, abdomen, skin, and extremities. Dr. Cook found all of the above to be within normal limits. Dr. Cook further performed an examination of Ramonas' back; performed a neurological examination; and ordered x-rays of Ramonas' lumbosacral spine and pelvis, which he also found to be within normal limits. Given these results, Dr. Cook did not find it necessary to perform any more extensive testing. This Court finds these facts to be strikingly similar to those of *Vickers* and *Baber*.

The plaintiff argues that, for purposes of EMTALA, whether a hospital's screening procedure is "appropriate" is a question of fact and that his experts have testified that JMH did not provide an appropriate screening exam. This Court disagrees with the plaintiff's proposed standard; rather, this Court will follow the sound logic of the Fourth Circuit's opinions in *Vickers* and *Baber*. As such, this Court affirms its prior ruling regarding the same.

## V. Conclusion

Accordingly, based upon the above, it is the opinion of this Court that the Plaintiff's Motion to Reconsider **[Doc. 132]** should be, and the same is, hereby **ORDERED DENIED**. Accordingly, this Court's Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment **[Doc. 127]** is hereby **AFFIRMED**. As a final matter, Defendant Jefferson Memorial Hospital's Motion for Leave to File Surreply **[Doc. 138]** is **GRANTED**; however, the defendant is not required to refile its surreply, attached as Doc. 138-1, as this

Court has already considered it in determining its ruling on this motion for reconsideration.

It is so **ORDERED**.

The Clerk is directed to transmit a copies of this Order to all counsel of record herein.

**DATED:** October 13, 2009.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE